2021R00442/LR/SB

**FILED**

SEP 2 2 2022

AT 8:30 ~ 4̶⁴⁰ PM
WILLIAM T. WALSH
CLERK

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | Hon. |
| | : | |
| v. | : | Crim. No. 22- 643 (CPO) |
| | : | |
| JAMES PATTEN, | : | Count One |
| PETER COKER, SR., and | : | 18 U.S.C. § 371 |
| PETER COKER, JR. | : | (Securities Fraud Conspiracy) |
| | : | |
| | : | Count Two |
| | : | 15 U.S.C. § 78ff |
| | : | 15 U.S.C. § 78j(b) |
| | : | 17 C.F.R. § 240.10b-5 |
| | : | 18 U.S.C. § 2 |
| | : | (Securities Fraud) |
| | : | |
| | : | Count Three |
| | : | 18 U.S.C. § 371 |
| | : | (Conspiracy to Manipulate |
| | : | Securities) |
| | : | |
| | : | Counts Four through Seven |
| | : | 15 U.S.C. § 78i(a)(2) |
| | : | 15 U.S.C. § 78ff |
| | : | 18 U.S.C. § 2 |
| | : | (Manipulation of Securities |
| | : | Prices) |
| | : | |
| | : | Counts Eight through Eleven |
| | : | 18 U.S.C. § 1343 |
| | : | 18 U.S.C. § 2 |
| | : | (Wire Fraud) |
| | : | |
| | : | Count Twelve |
| | : | 18 U.S.C. § 1956(a)(1)(B)(i) |
| | : | (Money Laundering) |

## INDICTMENT

The Grand Jury in and for the District of New Jersey, sitting at Newark, charges as follows:

## COUNT ONE
(Conspiracy to Commit Securities Fraud – 18 U.S.C. § 371)

### Individuals, Entities, and Definitions

1.    At all times relevant to this Indictment:

a.    The entity referred to as the "Deli" herein was a delicatessen located in Paulsboro, New Jersey that was incorporated under the laws of Nevada in or around 2015. The Deli was closed at certain points during the period of the Indictment.

b.    Hometown International, Inc. ("Hometown International"), a publicly traded company that utilized the ticker "HWIN," was the umbrella corporation of which the Deli was a wholly owned subsidiary.

c.    E-Waste Corporation ("E-Waste"), incorporated in Florida in or around 2012, was a publicly traded company that utilized the ticker "EWST."

d.    Defendant JAMES PATTEN ("PATTEN") was a resident of Basking Ridge, New Jersey until in or around August 2017 and then Winston-Salem, North Carolina. PATTEN previously worked as a stockbroker, but the Financial Industry Regulatory Authority, Inc. ("FINRA") barred PATTEN acting as a stockbroker or associating with broker-dealers in or around 2006.

e.    Defendant PETER COKER, SR. ("COKER, SR.") was a resident of Chapel Hill, North Carolina.

2

f. Defendant PETER COKER, JR. ("COKER, JR.") was a resident of Hong Kong, China.

g. Co-Conspirator-1 was a resident of Greensboro, North Carolina.

h. Co-Conspirator-2 was a resident of Hong Kong, China.

i. Co-Conspirator-3 was a resident of Raleigh, North Carolina.

j. Co-Conspirator-4 was a resident of Hong Kong, China.

k. Tryon Capital LLC ("Tryon Capital"), a North Carolina limited liability corporation, was controlled and operated by COKER, SR. and Co-Conspirator-1. PATTEN was also associated with Tryon Capital.

l. VCH Limited, a Macau, China entity, was believed to be controlled by COKER, JR.

m. Individual-1 was a resident of Gloucester County, New Jersey. Individual-1 was one of the founders of the Deli and was initially listed as the President of Hometown International.

n. Individual-2 was a resident of Salem County, New Jersey. Individual-2 was one of the founders of the Deli and was initially listed as the Vice-President of Hometown International.

o. Individual-3 was a resident of Staten Island, New York and held an investment account at Brokerage Firm-1.

p. Individual-4, an immediate family member of PATTEN'S romantic partner, was a resident of Gibson, New Jersey and held an investment account at Brokerage Firm-2.

3

q.     Individual-5, an immediate family member of COKER, SR., was a resident of Greensboro, North Carolina who held an investment account at Brokerage Firm-3.

r.     Individual-6 was a resident of Glen Ridge, New Jersey.

s.     Individual-7 was a resident of Greensboro, North Carolina and held an investment account at Brokerage Firm-3.

t.     Individual-8 was a resident of Greensboro, North Carolina and held an investment account at Brokerage Firm-3.

u.     Individual-9 was a resident of Bahama, North Carolina.

v.     The OTC Link Alternative Trading System is an alternative trading system that contains three tiers of markets, which are largely based on the quality and quantity of the listed companies' information and disclosures. "OTC Pink" is the lowest tier, and most speculative of the marketplaces. "OTCQB" is the middle tier, which requires that listed companies meet certain eligibility standards. "OTCQX" is the top tier of the three marketplaces and requires that listed companies meet more stringent eligibility requirements (altogether, the "OTC Marketplace"). Stocks sold on the OTC Marketplace are particularly susceptible to manipulative trading and other forms of fraud because, among other things, they are often thinly traded, and their free-trading shares may be controlled by a single individual or group of individuals. OTC Marketplace's primary servers are in New Jersey.

w.     "Wash Trades" are purchases and sales of securities that match each other in price, volume, and time of execution, and involve no change

4

in beneficial ownership. For example, a Wash Trade takes place when Investor A buys 100 shares of Company A at $5.00 through Broker A while simultaneously selling 100 shares of Company A at $5.00 through Broker B.

x.     "Match Trades" are similar to Wash Trades, but involve a related third-person or third-party who conducts one side of the trade. For example, a Match Trade takes place when Investor A buys 100 shares of Company A at $5.00, while Investor B, who coordinates with Investor A, simultaneously sells 100 shares of Company A at $5.00.

y.     "Coordinated Trading Events" or "CTEs" are trading events, such as Match Trades and Wash Trades, that are used to create the appearance that a given stock price rose as a result of genuine market demand for the manipulated security.

z.     A "Reverse Merger" is a transaction through which an existing public company merges with a private operating company—usually one that is seeking access to funding in the United States capital markets in order for the private operating company to be listed on an exchange without conducting an initial public offering. Typically, the shareholders of the private operating company exchange their shares for a large majority of the shares of the public company. While the public company technically "survives" the Reverse Merger, the private operating company's shareholders gain a controlling interest in the voting power and outstanding shares of stock. Additionally, the private company's management typically takes over and replaces the board of directors and management of the public company.

5

## The Conspiracy

2.     From in or around 2014 through in or around September 2022, in Gloucester County, in the District of New Jersey, and elsewhere, the defendants,

### JAMES PATTEN,
### PETER COKER, SR., and
### PETER COKER, JR.,

did willfully and knowingly combine, conspire, confederate and agree with each other and others, by the use of the means and instrumentalities of interstate commerce, and of the mails, and of facilities of national securities exchanges, to use and employ, in connection with the purchase and sale of securities, manipulative and deceptive devices and contrivances by: (a) employing devices, schemes, and artifices to defraud; (b) making untrue statements of material facts and omitting to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engaging in acts, practices and courses of business which operated and would operate as a fraud and deceit upon persons, contrary to Title 15, United States Code, Sections 78j(b) and 78ff, and Title 17, Code of Federal Regulations, Section 240.10b-5.

## Goal of the Conspiracy

3.     The goal of the conspiracy was for PATTEN, COKER, SR., COKER, JR. and their Co-Conspirators to enrich themselves through a scheme to manipulate the price of securities through a pattern of coordinated conduct intended to deceive, and by making and causing to be made fraudulent pretenses, representations, and promises to brokerage firms, market makers,

6

market regulators, and the trading public, injecting inaccurate information into the marketplace, and creating false impressions of supply and demand for these securities.

## **Manner and Means**

4.    It was part of the conspiracy that:

a.    To accomplish the goal of the conspiracy, PATTEN, COKER, SR., and COKER, JR. targeted two publicly traded companies, the first of which they caused to be created: (1) Hometown International, and (2) E-Waste. In both cases, PATTEN capitalized on long-term friendships and preyed on his friends and associates by presenting the plan as a legitimate business opportunity, as opposed to a fraudulent scheme. PATTEN, COKER, SR., and COKER, JR. took significant steps to gain control of the respective entities' management and stock with the ultimate intention of entering Reverse Mergers that would allow them to sell shares of each respective entity at a significant profit resulting from market manipulation.

### The Hometown International Scheme

b.    In or around 2014, Individual-1 and Individual-2 began the process of opening a local delicatessen to operate in Paulsboro, New Jersey (i.e., the Deli). Individual-1 discussed his interest in opening the Deli with PATTEN, a long-time friend. PATTEN, who had a background in business and finance, offered to assist Individual-1 and Individual-2 with opening the Deli and recommended that Individual-1 and Individual-2 incorporate the Deli. In addition, while residing in Basking Ridge, New Jersey, PATTEN suggested the

7

creation of Hometown International, an umbrella corporation, under which the Deli would operate as a wholly owned subsidiary. PATTEN explained that creating Hometown International would allow for easy expansion in the event the Deli was successful.

            c.     The Deli opened for business on or about October 14, 2015. Individual-1 and Individual-2 were responsible for the day-to-day operations of the Deli. Although Individual-1 was listed as the President, and Individual-2 the Vice-President of Hometown International, PATTEN acted as an unnamed control person and handled the majority of corporate-related decisions, issues, and tasks. Indeed, Individual-1 and Individual-2 were nominal officers—that is, Individual-1 and Individual-2 had virtually no involvement or practical responsibilities with respect to the control, operation, and management of Hometown International.

            d.     Almost immediately after Hometown International was formed, PATTEN and his associates began positioning Hometown International as a vehicle for a Reverse Merger that would yield substantial profit to them. From in or around July 2014 through in or around June 2015, PATTEN and COKER, SR. arranged the private sale of Hometown International shares to a number of individuals and entities that were either related to, or associated with, PATTEN, COKER, SR., COKER, JR., and/or Co-Conspirator-1, COKER, SR.'s business associate. These shares were exempt from registration under Regulation D of the Securities Act, a Securities and Exchange ("SEC") regulation

8

governing private placement exemptions, meaning they did not have to be registered with the SEC.

   e. In or around October 2019, Hometown International began publicly selling shares on OTC Pink. Shortly thereafter, PATTEN, COKER, SR., and COKER, JR. undertook a calculated scheme to gain control of Hometown International's shares. In or around December 2019, PATTEN arranged for COKER, JR. to purchase approximately 2 million shares, constituting approximately 38% of the outstanding Hometown International stock, from Individual-1 and Individual-2 for approximately $3,000. In or around February 2020, PATTEN arranged for the sale of an option to COKER, JR. that would allow him to purchase approximately 1.5 million shares, constituting approximately 28% of the outstanding Hometown International stock, from Individual-2. Shortly thereafter, COKER, JR. became Hometown International's Chairman of the Board. In or around March 2020, COKER, JR. exercised the option and purchased the approximately 1.5 million shares for approximately $500.

   f. After gaining control of Hometown International's management and stock, PATTEN, COKER, SR., and COKER, JR. undertook a scheme to transfer the shares to nominee entities and family members, friends, and associates. PATTEN, COKER, SR., and COKER, JR. transferred the shares for three primary purposes: (1) to give the appearance that there were more shareholders than there actually were; (2) to facilitate CTEs in order to artificially inflate the price of Hometown International's stock without alerting brokerage firms, market makers, market regulators, and the trading public; and (3) to give

9

the appearance of an arm's-length relationship between management and shareholders.

g. As part of the scheme, in or around March 2020, Hometown International issued approximately 100,000 shares of common stock to Europa Capital Investments, LLC ("Europa Capital"), an entity controlled by COKER, SR. and Co-Conspirator-1. In or around April 2020, PATTEN, COKER, SR., and COKER, JR. arranged for the approximately 3.5 million Hometown International shares that COKER, JR. had acquired from Individual-1 and Individual-2 to be transferred to four nominee entities in Macau, China (including VCH Limited), all of which were under COKER, JR.'s control, but formally in the names of other individuals. In or around May 2020, Europa Capital began systematically "gifting" its approximately 100,000 shares to approximately twenty-one (21) individuals, most of whom had a relationship with PATTEN, COKER, SR., COKER, JR., and/or Co-Conspirator-1.

h. Once PATTEN, COKER, SR., and COKER, JR. had transferred the majority of the Hometown International shares, they arranged the filing of a Form S-1 Registration Statement with the SEC in order to register these shares (the "Form S-1 Application"), thereby enabling the sale of Hometown International shares on the open market. Despite the fact that the shares were registered to their friends, family members, associates, and entities under their control, the Form S-1 Application stated that "[n]one of the Selling Shareholders nor any of their respective affiliates have held a position or office, or had any other material relationship with us or any of our predecessors or affiliates." The

10

SEC approved the Form S-1 Application on or about October 15, 2020 (the "S-1 Approval").

      i.     PATTEN, COKER, SR., and COKER, JR. used the S-1 Approval and the transfer of shares to their family, friends, and associates to "uplist" Hometown International from OTC Pink to OTCQB, a more desirable market within the OTC Marketplace that has a fifty-shareholder requirement. This elevation was advantageous in that it provided fewer restrictions to trading and greater visibility for Hometown International. But most notably, this elevation allowed Hometown International shares to be sold at a price greater than \$6.50 per share, the amount at which they were previously capped.

      j.     The elevation to the OTCQB allowed PATTEN, COKER, SR., and COKER, JR. to facilitate their fraudulent scheme. Once PATTEN, COKER, SR., and COKER, JR. had the ability to trade the shares on the open market without price restrictions, they systematically engaged and caused others to engage in a series of contemporaneous transactions designed to artificially influence the market price of Hometown International's stock based on the false impression that there was real market interest in the securities through Match Trades and Wash Trades (*i.e.*, Coordinated Trading Events or CTEs). PATTEN, COKER, SR., and COKER, JR engaged and caused others to engage in these CTEs in order to artificially increase the stock price of Hometown International and ultimately make Hometown International appear attractive to private companies interested in a Reverse Merger with a publicly traded company, at

11

which point PATTEN, COKER, SR., and COKER, JR. would arrange the sale of HWIN shares at a profit.

k.     PATTEN, COKER, SR., and COKER, JR.: (1) engaged other individuals who they encouraged to participate in certain aspects of the CTEs; and (2) gained access and control over trading accounts that were rightfully held by their family members, friends, and associates, and used those accounts to engage in CTEs. This had the effect of masking PATTEN, COKER, SR., and COKER, JR.'s participation in and control of the affected entities and accounts.

l.     For example, on or about December 15, 2020, COKER, JR., in an email to PATTEN and COKER, SR., advised that he had engaged Co-Conspirator-2 to participate in CTEs, stating "[First name and last initial of Co-Conspirator-2] MY HOTEL GUY SHOULD HAVE HIS ACCOUNT SET UP TO TRADE HWIN BY THURSDAY LATEST. I WILL PUT YOU GUYS IN TOUCH WITH [Co-Conspirator-1's first name] TO GET HIS ORDERS SORTED ON A DAILY BASIS." Shortly thereafter, Co-Conspirator-2 and PATTEN engaged in the following CTEs:

> i.     On or about December 15, 2020, Co-Conspirator-2 placed an order to purchase 100 shares of Hometown International for $11.85 per share. This order was filled by an account that was registered to Individual-3, an associate of PATTEN, from an IP Address that resolved to PATTEN'S residence.

> ii.     On or about January 5, 2021, at approximately 11:13 a.m., Co-Conspirator-2 placed an order to purchase 100 shares of

12

Hometown International for $13.25 per share. Shortly thereafter, at approximately 12:49 p.m., this order was filled by an account registered to Individual-4, an individual related to PATTEN'S romantic partner, from an IP Address that resolved to PATTEN'S residence.

iii.     On or about January 29, 2021, at approximately 11:03 a.m., Co-Conspirator-2 placed an order to purchase 100 shares of Hometown International for $13.70. Minutes later, at approximately 11:06 a.m., this order was filled by an account registered to Individual-5, an immediate family member of COKER, SR., from an IP Address that resolved to PATTEN'S residence.

m.     As noted above, PATTEN, COKER, SR., and COKER, JR. also facilitated CTEs by accessing trading accounts that belonged to their family members, friends, and associates. For instance:

i.     On or about January 19, 2021, the account registered to Individual-3 placed an order to purchase 200 shares of Hometown International for $13.99 per share. This order was filled by Individual-4. Notably, both of these transactions were conducted from an IP Address that resolved to PATTEN'S residence.

ii.     On or about February 4, 2021, at approximately 11:56 a.m., the account registered to Co-Conspirator-2 placed an order to purchase 100 shares of Hometown International for $13.80 per share. Approximately twenty minutes later, at approximately 12:19

13

p.m., this order was filled by an account registered to COKER, SR. Notably, both transactions were conducted from an IP Address that resolved to PATTEN and COKER, SR.'s place of employment.

iii.        On or about February 22, 2021, at approximately 9:17 a.m., the account registered to Co-Conspirator-2 placed two orders to purchase 100 shares of Hometown International for $13.85 per share from an IP Address associated with COKER, SR. Approximately two hours later, at 11:21 a.m., one order was filled by an account registered to COKER, SR. from an IP Address that resolved to PATTEN'S residence. Shortly thereafter, at approximately 12:07 p.m., the second order was filled by an account registered to Individual-5 from an IP Address that resolved to PATTEN'S residence.

n.        PATTEN monitored the trading of Hometown International shares and received weekly reports outlining the trading volume. For instance, on or about February 13, 2021, PATTEN discussed a report with COKER, Sr., writing "everyone [is] playing nice. All seems to check out."

o.        PATTEN, COKER, SR., and COKER, JR.'s efforts to manipulate Hometown International's shares had the ultimate impact of artificially inflating the stock approximately 939%. Indeed, on the first day that Hometown International was publicly traded, on or about October 25, 2019, the stock's closing price was approximately $1.25 per share. On or about April 16, 2021, Hometown International's stock closed at approximately $12.99 per share.

14

p.     In addition, in an effort to enrich themselves, over the course of the scheme, PATTEN, COKER, SR., and COKER, JR. orchestrated the execution of consulting agreements between Hometown International and Tryon Capital, controlled by COKER, SR. and Co-Conspirator-1, and VCH Limited, one of COKER JR.'s nominee entities. Pursuant to these agreements, Hometown International paid approximately $15,000 per month to COKER, SR. and Co-Conspirator-1 (through Tryon Capital), and approximately $25,000 a month to COKER JR. (through VCH Limited) during the period of these consulting agreements.

q.     On March 31, 2022, Hometown International announced that it had entered into a Reverse Merger with Makamer Holdings, Inc. Hometown International's application to FINRA for a ticker symbol change remains pending. PATTEN, COKER, SR., and COKER, JR. have not yet sold shares of Hometown International for a profit.

### The E-Waste Scheme

r.     In or around September 2020, PATTEN recruited Individual-6, another long-time friend, to assist E-Waste, an unsuccessful, yet publicly traded company, in finding a candidate for a Reverse Merger. Shortly thereafter, PATTEN arranged for Individual-6 to become Chief Executive Officer of E-Waste, despite the fact that PATTEN was effectively in control. As with Hometown International, PATTEN, COKER, SR., and COKER, JR. took actions to control E-Waste's stock, artificially inflate its stock price through CTEs, and ultimately market E-Waste in order to execute a Reverse Merger.

15

s.    PATTEN, COKER, SR., and COKER, JR. subsequently arranged for the transfer of millions of shares of E-Waste stock to a number of nominee entities, and to themselves personally. For instance, on or about September 25, 2020, E-Waste sold approximately six-million shares to Global Equity, an entity controlled by COKER, JR. On the same day, COKER, JR., and Benchmark Capital, LLC, a company controlled by PATTEN, attained approximately 475,000 and 250,000 shares of E-Waste, respectively. On or about October 14, 2020, E-Waste sold approximately 500,000 shares to both COKER, JR. and Europa Capital—an entity controlled by COKER, SR and Co-Conspirator-1.

t.    After PATTEN, COKER, SR., and COKER, JR. gained control of E-Waste's shares, PATTEN commenced a series of CTEs intended to artificially inflate the value of E-Waste's stock. For example:

    i.    On or about November 19, 2020 at approximately 11:21 a.m., an account registered to Individual-7 placed an order to buy 100 shares of E-Waste for $2.66 per share from an IP Address that resolved to PATTEN'S residence. Approximately two minutes later, at approximately 11:23 a.m., the order was filled by an account registered to Individual-3 from the same IP Address, which, again, resolved to PATTEN'S residence.

    ii.    On or about January 22, 2021, an account registered to Individual-5 placed an order to purchase 200 shares of E-Waste for $6.49 per share from an IP Address that resolved to PATTEN'S

16

residence. The order was filled by an account registered to Individual-3 from the same IP Address, which, again, resolved to PATTEN'S residence.

iii.     On or about March 22, 2021, at approximately 2:17 p.m., an account registered to Individual-7 placed an order to purchase 176 shares of E-Waste for $9.46 per share from an IP Address that resolved to PATTEN'S residence. Approximately two minutes later, at 2:19 p.m., the order was filled by an account registered to Individual-8 from the same IP Address, which, again, resolved to PATTEN'S residence.

iv.     On or about April 9, 2021, at approximately 1:27 p.m., an account registered to Individual-7 placed an order to purchase 100 shares of E-Waste for $10.00 per share from an IP Address that resolved to PATTEN'S residence. Approximately ten minutes later, at 1:37 p.m., the order was filled by an account registered to Individual-3 from the same IP Address, which, again, resolved to PATTEN'S residence.

u.     PATTEN, COKER, SR., and COKER, JR.'s efforts to manipulate E-Waste's shares had the ultimate impact of artificially inflating the stock approximately 19,900%. Indeed, on the first day of HWIN trading, July 6, 2020, EWST's closing price was approximately $0.05 per share. On April 16, 2021, EWST closed at approximately $10.00 per share.

17

v. In addition—like with Hometown International—in an effort to enrich themselves, over the course of the scheme, PATTEN and COKER, SR. orchestrated the execution of consulting agreements between E-Waste and Tryon Capital, controlled by COKER, SR. and Co-Conspirator-1, and Benchmark Capital, controlled by PATTEN. Pursuant to these agreements, E-Waste paid $2,500 per month to COKER, SR. and Co-Conspirator-1 (through Tryon Capital), and $5,000 a month to PATTEN (through Benchmark Capital) during the period of these agreements.

w. In or around September 2021, E-Waste merged with EZRaider Global, Inc. A registration statement has not yet been filed. PATTEN, COKER, SR., and COKER, JR. have not yet sold their shares of E-Waste for a profit.

## Overt Acts

5. In furtherance of the conspiracy and to effect the objects of the conspiracy, the following overt acts, among others, were committed in the District of New Jersey and elsewhere.

a. On or about February 20, 2017, PATTEN sent an email to Individual-1 containing a letter, dated February 21, 2017, purportedly written by Individual-1, to FINRA in response to an inquiry from FINRA regarding Hometown International's common stock (the "February 21 Letter"). Individual-1, who was residing in New Jersey, denied writing the February 21 Letter and believes that PATTEN wrote the letter in his role as an unnamed control person of Hometown International. The February 21 Letter appears to have been

18

intended to induce FINRA to approve a portion of Hometown International's application to be listed on the OTC Marketplace.

b. On or about March 20, 2020, COKER, JR. sent an email to COKER, SR., indicating that he had received advice from Co-Conspirator-4 to "PUT MY SHARES INTO A COMPANY NOT IN MY NAME (FINE WITH ME) BECAUSE WE ARE CLOSE AND IT COULD LOOK STRANGE TO HIS GUYS.. SO CAN I GIVE YOU A COMPANY NAME TOMORROW WHERE WE CAN PUT THE SHARES IN MACAO?" Shortly after this email, PATTEN, COKER, JR., and COKER, SR. transferred approximately 3.5 million Hometown International shares to a number of nominee entities located in Macao, China (including VCH Limited).

c. On or about May 10, 2020, PATTEN sent an email to Individual-9, copying COKER, SR., which contained wire transfer instructions to pay VCH Limited $25,000 pursuant to one of the consulting agreements discussed above. The investigation revealed that multiple large wire transfers were conducted from Hometown International's bank account in New Jersey to VCH Limited.

d. On or about November 10, 2020, COKER, JR. sent an email to PATTEN, COKER, SR., Co-Conspirator-4, and others, stating "WE HAVE SPENT AN ENORMOUS AMOUNT OF TIME CURATING THIS ASSET AND ARE NOW READY TO TAKE HOMETOWN TO THE NEXT LEVEL (NASDAQ, ETC)."

e. On or about December 15, 2020, COKER, JR. sent an email to PATTEN and COKER, SR., stating "[First name and last initial of Co-

Conspirator-2] MY HOTEL GUY SHOULD HAVE HIS ACCOUNT SET UP TO TRADE HWIN BY THURSDAY LATEST. I WILL PUT YOU GUYS IN TOUCH WITH [Co-Conspirator-1's first name] TO GET HIS ORDERS SORTED ON A DAILY BASIS." COKER, SR. responded to COKER, JR.'s email that he "will keep it light." As discussed above, Co-Conspirator-2 was an instrumental participant in the CTEs that led to the artificial inflation of Hometown International's valuation.

f. On or about January 23, 2021, PATTEN sent an email to COKER, SR. discussing the transfer and trade of a significant volume of shares. COKER, SR. responded, "I have been looking at all of the others and making sure I know what is going on. Can you take a copy of [Individual-5's] Fidelity account?" As discussed, Individual-5's account was used in a number of CTEs involving both Hometown International and E-Waste, the majority of which were conducted from IP Addresses that resolved to PATTEN'S residence.

g. On or about February 28, 2021, PATTEN sent an email to COKER, SR. stating, "[h]ere are the available cash balances: . . . [Individual-7's middle name] $5,902.41 – [abbreviation of Individual-8's first name] $2,980.34 – [Individual-5's first name] $4,790.64 . . ." COKER, SR. responded, "[t]hanks Jim. Is it easy to give me [Individual-5's first name's] holdings – if not please wait until later as it is not urgent. Thanks." As discussed, Individual-5's trading accounts were used to engage in multiple CTEs from an IP Address that resolved to PATTEN.

### Conclusion

6.     On or about April 16, 2021, a news article exposing Hometown International and E-Waste's over-inflated market valuations was published. PATTEN, COKER, JR., and COKER, SR. acknowledged reading the article in email communications. The negative publicity, which received a significant amount of attention, came at a point when PATTEN, COKER, SR., and COKER, JR. were in the middle of the scheme, and had not yet sold their inflated shares.

All in violation of Title 18, United States Code, Section 371.

**COUNT TWO**
(Securities Fraud – 15 U.S.C. § 78j(b))

7.     Paragraphs One, Four, Five, and Six of Count One are re-alleged and incorporated as if set forth fully herein.

8.     From in or around 2014 through in or around September 2022, in Gloucester County, in the District of New Jersey, and elsewhere, the defendants,

**JAMES PATTEN,
PETER COKER, SR., and
PETER COKER, JR.,**

knowingly and willfully, directly and indirectly, by the use of the means and instrumentalities of interstate commerce, the mails, and the facilities of national securities exchanges, in connection with the purchase and sale of securities, did use and employ manipulative and deceptive devices and contrivances, and aided and abetted others known and unknown to the grand jury, and attempted to do so by: (a) employing devices, schemes, and artifices to defraud; (b) making, and causing others to make, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and (c) engaging in acts, practices, and courses of business which operated and would operate as a fraud and deceit upon persons—that is, PATTEN, COKER, SR., and COKER, JR. and others engaged in a scheme to manipulate the price of securities through a pattern of coordinated trading conduct intended to deceive, and by making and causing to be made fraudulent pretenses, representations, and promises to, brokerage firms, market makers, market regulators, and the trading public,

22

injecting inaccurate information into the marketplace, and creating the false impressions of supply and demand for these securities.

In violation of Title 15, United States Code, Sections 78j(b) and 78ff, Title 17, Code of Federal Regulations, Section 240.10b-5, and Title 18, United States Code, Section 2.

## COUNT THREE

(Conspiracy to Manipulate Securities Prices – 18 U.S.C. § 371)

9.     Paragraphs One, Four, Five, and Six of Count One are re-alleged and incorporated as if set forth fully herein.

10.     From in or around 2014 through in or around September 2022, in the District of New Jersey, and elsewhere, the defendants,

### JAMES PATTEN,
### PETER COKER, SR., and
### PETER COKER, JR.,

did willfully and knowingly combine, conspire, confederate and agree with each other and others, to, alone and with one or more other persons, effect a series of transactions, in securities registered on a national securities exchange, creating actual or apparent active trading in such security, and raising or depressing the price of such security, for the purpose of inducing the purchase and sale of such security by others, contrary to Title 15, United States Code, Sections 78i(a)(2) and 78ff, and Title 18, United States Code, Section 2.

### Goal of the Conspiracy

11.     The goal of the conspiracy was for PATTEN, COKER, SR., COKER, JR., and their Co-Conspirators to unlawfully manipulate the price of the securities in which they were trading and to profit from their actions.

### Overt Acts

12.     In furtherance of the conspiracy and to effect the objects of the conspiracy, the overt acts described in Paragraph 5 of Count One, among others, were committed in the District of New Jersey and elsewhere.

All in violation of Title 18, United States Code, Section 371.

## COUNTS FOUR THROUGH SEVEN

(Manipulation of Securities Prices – 15 U.S.C. §§ 78i(a)(2) and 78ff)

13.     Paragraphs One, Four, Five, and Six of Count One are re-alleged and incorporated as if set forth fully herein.

14.     From in or around 2014 through in or around September 2022, in the District of New Jersey, and elsewhere, the defendant,

### JAMES PATTEN,

willfully, alone and with one or more other persons, effected a series of transactions, in a security registered on a national securities exchange, creating actual or apparent active trading in such security, and raising or depressing the price of such security, for the purpose of inducing the purchase and sale of such security by others, to wit: the CTE transactions set forth below, each constituting a separate count of this Indictment:

| Count | Approximate Date and Time | Ticker | Brokerage Accounts |
|-------|---------------------------|--------|--------------------|
| Four  | March 1, 2021 12:00 p.m.  | HWIN   | Individual-3's account at Brokerage Firm-1 |
| Five  | March 1, 2021 12:01 p.m.  | HWIN   | Individual-4's account at Brokerage Firm-2 |
| Six   | April 9, 2021 1:27 p.m.   | EWST   | Individual-7's account at Brokerage Firm-3 |
| Seven | April 9, 2021 1:37 p.m.   | EWST   | Individual-3's account at Brokerage Firm-1 |

In violation of Title 15, United States Code, Sections 78i(a)(2) and 78ff, and Title 18, United States Code, Section 2.

25

## COUNTS EIGHT THROUGH ELEVEN
(Wire Fraud – 18 U.S.C. § 1343)

15.    Paragraphs One, Four, Five, and Six of Count One are re-alleged and incorporated as if set forth fully herein.

16.    From in or around November 2020 through in or around April 2021, in the District of New Jersey and elsewhere, the defendant,

### JAMES PATTEN,

did knowingly and intentionally devise a scheme and artifice to defraud investors and potential investors in Hometown International and E-Waste, and to obtain money and property from them by means of materially false and fraudulent pretenses, representations, and promises.

17.    The object of this scheme and artifice was to artificially inflate the stock price of Hometown International and E-Waste through multiple stock trading transactions, or CTEs, so that PATTEN and others could profit and unlawfully enrich themselves.

18.    On or about the dates set forth below, for the purpose of executing such scheme and artifice, the defendant, and others, did transmit and cause to be transmitted, by means of wire communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds, as set forth below:

| Count | Approximate Date | Description |
|-------|------------------|-------------|
| Eight | March 1, 2021 | At approximately 12:00 p.m., an account registered to Individual-3 placed an order to purchase 100 shares of Hometown International Stock for $13.85 per share. This transaction occurred from an IP Address that |

| | | |
|---|---|---|
| | | resolved to PATTEN's residence in Winston-Salem, North Carolina and involved OTC Market Servers in the District of New Jersey. |
| Nine | March 1, 2021 | At approximately 12:01 p.m., the order for 100 shares of HWIN stock, referenced in Count Eight, was filled by an account registered to Individual-4. This transaction occurred from an IP Address that resolved to PATTEN's residence in Winston-Salem, North Carolina and involved OTC Market Servers in the District of New Jersey. |
| Ten | April 9, 2021 | At approximately 1:27 p.m., an account registered to Individual-7 placed an order to purchase 100 shares of E-Waste stock for $10.00 per share. This transaction occurred from an IP Address that resolved to PATTEN'S residence in Winston-Salem, North Carolina and involved OTC Market Servers in the District of New Jersey. |
| Eleven | April 9, 2021 | At approximately 1:37 p.m., the order for 100 shares of E-Waste stock, referenced in Count Ten, was filled by an account registered to Individual-3. This transaction occurred from an IP Address that resolved to PATTEN'S residence in Winston-Salem, North Carolina and involved OTC Market Servers in the District of New Jersey. |

In violation of Title 18, United States Code, Section 1343 and Section 2.

## **COUNT TWELVE**

(Laundering of Monetary Instruments – 18 U.S.C. § 1956(a)(1)(B)(i))

19. Paragraphs Fifteen through Eighteen of Counts Eight through Eleven are re-alleged and incorporated as if fully set forth herein.

20. From in or around November 2020 through in or around April 2021, in the District of New Jersey, and elsewhere, the defendant,

## **JAMES PATTEN,**

knowing that the property involved in certain financial transactions, to wit, the manipulative purchases and sales of securities through brokerage accounts belonging to others, as outlined in Counts Eight through Eleven, represented the proceeds of some form of unlawful activity, would and did conduct and attempt to conduct such financial transactions, which in fact involved the proceeds of specified unlawful activity as defined in Title 18, United States Code, Section 1956(c)(7), to wit, proceeds from wire fraud, knowing that the transactions were designed in whole or in part to conceal and disguise the nature, location, source, ownership and control or the proceeds of specified unlawful activity.

In violation of Title 18, United States Code, Section 1956(a)(1)(B)(i) and Section 2.

28

## FORFEITURE ALLEGATION AS TO COUNTS ONE THROUGH ELEVEN

1.    Upon conviction of the offenses charged in Counts One through Eleven of this Indictment, the defendants,

**JAMES PATTEN,
PETER COKER, SR., and
PETER COKER, JR.,**

shall forfeit to the United States, pursuant to Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United States Code, Section 2461(c), all property, real and personal, that constitutes or is derived from proceeds traceable to the commission of the offenses charged in Counts One through Eleven of this Indictment, and all property traceable thereto.

## FORFEITURE ALLEGATION AS TO COUNT TWELVE

2.    As a result of committing the money laundering offense charged in Count Twelve of this Indictment, the defendant,

**JAMES PATTEN,**

shall forfeit to the United States, pursuant to Title 18, United States Code, Section 982(a)(1), all property, real or personal, involved in such money laundering offense, and all property traceable to such property.

29

## Substitute Assets Provision

2.     If any of the above-described forfeitable property, as a result of any act or omission of the defendants:

- a. cannot be located upon the exercise of due diligence;
- b. has been transferred or sold to, or deposited with, a third person;
- c. has been placed beyond the jurisdiction of the Court;
- d. has been substantially diminished in value; or
- e. has been commingled with other property which cannot be subdivided without difficulty,

it is the intent to the United States, pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 28, United States Code, Section 2461(c), to seek forfeiture or any other property of the defendants up to the value of the above-described forfeitable property.

A TRUE BILL

FOREPERSON

PHILIP R. SELLINGER
United States Attorney

30

**CASE NUMBER: 22-**

# United States District Court
# District of New Jersey

## UNITED STATES OF AMERICA

**v.**

## JAMES PATTEN,
## PETER COKER, SR., &
## PETER COKER, JR.

# INDICTMENT FOR

15 U.S.C. §§ 78ff, 78j(b) & 78i(a)(2)
17 C.F.R. § 240.10b-5
18 U.S.C. § 2
18 U.S.C. § 371
18 U.S.C. § 1343
18 U.S.C. § 1956(a)(1)(B)(i)

**A True Bill,**



*Foreperson*

**PHILIP R. SELLINGER**
*UNITED STATES ATTORNEY*
*NEWARK, NEW JERSEY*

LAUREN E. REPOLE
SHAWN P. BARNES
*ASSISTANT UNITED STATES ATTORNEYS*
*(973) 645-2848*